UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------x
ELIZABETH SEMPLE,                                      :
                                                       :
                            Plaintiff,           :     08 Civ. 9004 (HB)
                                                       :
           -against-                                  :     OPINION & ORDER
                                                       :
EYEBLASTER, INC., GAL TRIFON,                          :
LEHMAN BROTHERS, INC., and                             :
DEUTSCHE BANK SECURITIES INC.,                         :
                                                       :
                            Defendants.         :
-------------------------------------------------------------x
**Hon. HAROLD BAER, JR., United States District Judge:**

        Plaintiff Elizabeth Semple ("Plaintiff" or "Semple") filed an Amended Complaint alleging various causes of action against her former employer Eyeblaster, Inc. ("Eyeblaster"), its Chief Executive Officer Gal Trifon ("Trifon") (collectively, the "Eyeblaster Defendants"), Lehman Brothers, Inc. ("Lehman") and Deutsche Bank Securities Inc. ("DBSI") (collectively, "Underwriters") arising out of her inability to exercise her options to purchase Eyeblaster stock. Specifically, Semple brings the following claims: (1) tortious interference with contract against the Eyeblaster Defendants and the Underwriters; (2) tortious interference with business relations against the Eyeblaster Defendants; (3) breach of contract against the Eyeblaster Defendants and the Underwriters; and (4) fraud against the Eyeblaster Defendants. The Eyeblaster Defendants and DBSI[1] have moved to dismiss for failure to state a cause of action. For the reasons set forth below, the Underwriters' motion to dismiss is granted, and the Eyeblaster Defendants' motion to dismiss is granted in part and denied in part.

---

[1] Defendant Lehman served a Notice of Bankruptcy on October 24, 2008 advising that this case is stayed as against it pursuant to the provisions of 11 U.S.C. § 362. Lehman is currently under liquidation proceedings in this Court, *see Securities Inv. Prot. Corp. v. Lehman Brothers Inc.*, No. 08 Civ. 8119 (GEL), and is not a party to the instant motion to dismiss. However, as Plaintiff's factual allegations and causes of action against Lehman and DBSI are identical, and Plaintiff has received notice and an opportunity to be heard on DBSI's arguments as to the legal insufficiency of the claims against both Underwriters, this Court will consider the motion to dismiss as it pertains to the claims against both Underwriters. *See Wachtler v. County of Herkimer*, 35 F.3d 77, 82 (2d Cir. 1994) ("The district court has the power to dismiss a complaint *sua sponte* for failure to state a claim so long as the plaintiff is given notice and an opportunity to be heard.") (internal quotation marks and citations omitted); *In re Parmalat Secs. Litig.*, 377 F. Supp. 2d 390, 415 n.166 (S.D.N.Y. 2005) (dismissing *sua sponte* under Rule 12(b)(6) against a party that did not join in the motion to dismiss, where plaintiffs had ample notice and opportunity to be heard on the arguments underlying the motion to dismiss); *Winstar Comm'ns, LLC v. Equity Office Props. Inc.*, 04-CIV-3139 (KMW), 2005 U.S. Dist. LEXIS 42508, at *14 (S.D.N.Y. Jan. 24, 2005) (dismissing *sua sponte* as to defendant not party to motion to dismiss where allegations against all parties were identical, dotion to dismiss gave adequate notice claims may be defective, and plaintiffs had fair opportunity to be heard).

1

## I. FACTUAL BACKGROUND

Semple was employed as the Vice President for Human Resources at Eyeblaster from March 21, 2005 to April 20, 2008, when she terminated her employment with the company. Amended Complaint ("Am. Compl.) ¶¶ 7, 16. During her employment with Eyeblaster, Semple was granted options to purchase 74,000 shares of Eyeblaster stock pursuant to the 2007 Eyeblaster, Inc. Stock Option and Incentive Plan ("Eyeblaster Stock Option Plan"). *Id.* ¶¶ 8-9. By the date of her resignation, 26,868 of Semple's stock options had vested. *Id.* ¶ 17. Semple had until July 18, 2008 to exercise her vested Eyeblaster Options under the Eyeblaster Stock Option Plan, after which date those options would expire. *Id.* ¶ 18.

In January 2008, Eyeblaster began preparations for an initial public offering ("IPO") of its stock on the NASDAQ stock exchange. *Id.* ¶ 10. At approximately the same time, Eyeblaster entered into an agreement pursuant to which Lehman and DBSI would act as lead underwriters of the IPO. *See id.* ¶ 11. In March of 2008, Semple entered into a letter agreement with the Underwriters wherein she agreed, among other things, to certain restrictions on her right to sell or otherwise dispose of any shares of stock that she would be issued as the result of her exercise of her options to purchase Eyeblaster stock (the "Lock-Up Agreement"). *See* Declaration of Allen N. Taffet ("Taffet Decl.") Exh. A. Specifically, pursuant to the Lock-Up Agreement, Semple irrevocably agreed "that, without prior written consent of [the Underwriters], [Semple] will not, directly or indirectly, . . . offer for sale, sell, pledge, or otherwise dispose of (or enter into any transaction or device that is designed to, or could be expected to, result in the disposition by any person at any time in the future of) any shares of Common Stock . . . or securities convertible into or exercisable or exchangeable for Common Stock." *Id.* The Lock-Up Agreement further provided that Semple would be released from her obligation to obtain prior written consent on the occurrence of one of three delineated events: (1) if Eyeblaster notifies the Underwriters that it does not intend to proceed with the IPO; (2) if the Underwriting Agreement does not become effective by December 31, 2008; or (3) if the Underwriting Agreement terminates before payment for and delivery of the Stock. *Id.* Finally, by signing the Lock-Up Agreement, Semple acknowledged that Eyeblaster and the Underwriters "will proceed with the [IPO] in reliance on this Lock-Up Letter Agreement." *Id.* Eyeblaster was not a party to the Lock-Up Agreement. Am. Compl. ¶ 15.

Plaintiff alleges that on or about June 30, 2008, Sarit Firon ("Firon"), Eyeblaster's CFO, advised her that Eyeblaster did not intend to proceed with the IPO. Am. Compl. ¶ 19. Plaintiff

2

also alleges that, "Eyeblaster advised the Underwriters that it intended to withdraw the IPO." *Id.* ¶ 20.

At a certain point prior to June 30, 2008, Millennium Technology Value Partners, L.P. ("Millennium"), a private equity company, approached Semple and made an offer to acquire 23,868 shares of Eyeblaster stock for a purchase price of $310,264.00, and to provide her with the funds necessary to exercise her options to purchase those shares. *Id.* ¶¶ 21-22.  On June 30, 2008, Millennium and Semple entered into a Letter of Intent ("LOI"),[2] which set forth the "basic understandings between [Semple] and Millennium, with respect to the proposed Share Purchase." Affirmation of Patrick M. Collins ("Collins Aff.") Exh. 6.  The LOI outlined the terms of a contemplated sale of shares, but it explicitly stated that "no term or provision of this [LOI] shall constitute a commitment, agreement or binding agreement on the part of [Semple] or [Millennium] with the exception of the sections entitled 'Confidentiality' and 'No Shop' which shall be binding except to the extent agreed to in definitive and final documentation." *Id.*  The "No Shop" provision of the LOI provided that Semple "may not consummate a sale of the Shares to a party other than Millennium prior to the six month anniversary of the date [of the LOI], with the exception of a sale resulting from an exercise of [Eyeblaster's] right of first refusal." *Id.*  Plaintiff alleges that, as of the end of June or beginning of July, when she entered into the LOI with Millennium, and in reliance on that agreement, she planned to purchase the remaining 3,000 shares in which she had vested options with her own money.  Am. Compl. ¶ 23.

Shortly thereafter, in accordance with the terms of the Eyeblaster Stock Option Plan, Semple provided Eyeblaster with notice of her election to exercise her options to purchase 26,868 shares of stock, and also provided Eyeblaster with a copy of the LOI and thereby informed Eyeblaster that she intended to sell 23,868 of those shares to Millennium. *Id.* ¶¶ 24-25, 27. Pursuant to Eyeblaster's right of first refusal under the Eyeblaster Stock Option Plan, Semple offered to sell Eyeblaster certain of the shares in which she had the vested option to purchase on the same terms and conditions that Millennium had offered her, but Eyeblaster advised that it would not purchase the shares.  *Id.* ¶¶ 26, 28.  Semple also alleges that Firon advised her that Eyeblaster had no objection to her proposed sale of Eyeblaster stock to Millennium, but that Semple could not sell any of the stock she would acquire by exercising her options without first being released from the terms of the Lock-Up Agreement.  *Id.* ¶ 30.  Eyeblaster subsequently, in

---

[2] Although Plaintiff's Amended Complaint states that the LOI was entered "[i]n July 2008," the face of the document shows that the parties entered into the LOI on June 30, 2008.

an email message dated July 16, 2008, advised Semple that it would extend her time to exercise her vested options until August 18, 2008 to allow her additional time to obtain the Underwriters' consent to her proposed sale of stock to Millennium.  *Id.* ¶ 31.  Yet, Plaintiff alleges that three days earlier, on July 13, 2008, Firon had sent an email to a representative of Millennium, warning that Millennium should stop soliciting Eyeblaster's employees to sell stock to Millennium.  *Id.* ¶ 32.  Plaintiff alleges that the Eyeblaster Defendants were aware that, without the Millennium sale, she was unable to exercise her vested options because she lacked sufficient funds.  *Id.* ¶ 33.

Pursuant to Eyeblaster's advice, Semple's attorney contacted Lehman's counsel to determine whether Lehman would consent to release her from the Lock-Up Agreement.  *Id.* ¶ 34.  Semple's attorney was advised that the Underwriters consented to the sale and transfer of obligations under the Lock-Up Agreement.  *Id.* ¶ 36.  However, when Semple's attorney followed up to finalize documents that would provide that consent and release Semple from the Lock-Up Agreement, Lehman's counsel equivocated and "refused to release Semple."  *Id.* ¶ 37.  Plaintiff alleges that during a July 21, 2008 conversation, Trifon told her that the reason the Underwriters had refused to release her from the Lock-Up Agreement was that he (Trifon) had instructed them to withdraw their initial consent.  *Id.* ¶ 38.  Trifon also told Semple that he did not want her to be able to exercise her options and that "he did not want other Eyeblaster employees to understand that they could, through outside sources such as Millennium, obtain the liquidity they required to exercise their vested Eyeblaster options."  *Id.* ¶ 39.

Plaintiff subsequently requested a further extension of time until December 31, 2008 to secure a release from the Lock-Up Agreement and to exercise her vested options, but Eyeblaster refused to grant the extension beyond August 18, 2008.  *Id.* ¶¶ 40-41.  Ultimately, Millennium withdrew from its contemplated transaction with Semple, refusing to proceed with the LOI due to Semple's inability to obtain a release from the Lock-Up Agreement.  *Id.* ¶ 42.  Because she lacked sufficient liquidity of her own, Semple was unable to exercise her options before they expired.  *See id.* ¶ 43.

### III.  DISCUSSION
**A.    Legal Standard on a Motion to Dismiss**

To survive a motion to dismiss, a plaintiff must allege "only enough facts to state a claim to relief that is plausible on its face."  *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007).  A court must accept the facts alleged in the complaint as true, even if doubtful, and draw all

reasonable inferences in favor of the nonmoving party.  *Ruotolo v. City of New York*, 514 F.3d 184, 188 (2d Cir. 2008); *Cosmas v. Hassett*, 886 F.2d 8, 11 (2d Cir. 1989).  In deciding a motion to dismiss, the Court must apply a "flexible 'plausibility standard,' which obliges a pleader to amplify a claim with some factual allegations in those contexts where such amplification is needed to render the claim plausible."  *Iqbal v. Hasty*, 490 F.3d 143, 157-58 (2d Cir. 2007).  This standard requires "factual allegations sufficient 'to raise a right to relief above the speculative level.'"  *Boykin v. KeyCorp*, 521 F.3d 202, 213 (2d Cir. 2008) (quoting *Twombly*, 550 U.S. at 555).

       Additionally, in considering the sufficiency of the allegations of a claim for fraud, the Court must examine the allegations in the complaint with an eye toward the heightened pleading standard of Rule 9(b) of the Federal Rules of Civil Procedure.  Although Rule 9(b) must be read in conjunction with Rule 8(a), which requires only a "short and plain statement" of the claim asserted, the fraud allegations must nonetheless be sufficiently specific to "give the defendant adequate information to allow the defendant to frame a response" and "to allow the defendant a reasonable opportunity to answer the complaint."  *Kermanshah v. Kermanshah*, 580 F. Supp. 2d 247, 257 (S.D.N.Y. 2008) (citing *Ross v. H.H. Robins Co.*, 607 F.2d 545, 557-58 (2d Cir. 1979), *cert. denied*, 446 U.S. 946 (1980)) (internal quotation marks omitted).

       In deciding a motion to dismiss, the Court may consider documents attached as exhibits to the complaint or incorporated into the complaint by reference, documents that are integral to the plaintiff's claims, even if not explicitly incorporated by reference, and matters of which judicial notice may be taken.  *See* Fed. R. Civ. P. 10(c); *De Jesus v. Sears, Roebuck & Co.*, 87 F.3d 65, 69 (2d Cir. 1996); *Cortec Indus., Inc. v. Sum Holding L.P.*, 949 F.2d 42, 46-48 (2d Cir. 1991), *cert. denied*, 503 U.S. 960 (1992); *Allen v. WestPoint-Pepperell, Inc.*, 945 F.2d 40, 44 (2d Cir. 1991); *Thomas v. Westchester County Health Care Corp.*, 232 F. Supp. 2d 273, 275 (S.D.N.Y. 2002). When documents are integral, known of and possessed by the plaintiff, and there is no dispute as to their authenticity, the Court may consider them on a motion to dismiss.  *Thomas*, 232 F. Supp. 2d at 276 (citing *Parrino v. FHP, Inc.*, 146 F.3d 699, 705 & n.4 (9th Cir. 1998); *Cortec*, 949 F.2d at 48).

**B.**    **Claims Against the Underwriters**

      *1.  Tortious Interference with Contract*

       Plaintiff alleges that the Underwriters are liable for tortious interference with contract for interfering with the LOI with Millennium by withdrawing their initial consent to her sale of stock

options under the Lock-Up Agreement.  *See* Am. Compl. ¶ 46, 50.  Plaintiff alleges that such interference "induced Millennium to breach the [LOI]," or alternatively, that it "render[ed] performance of the [LOI] impossible."  *Id.* ¶¶ 51-52.  To prevail on her claim for tortious interference with contract, Plaintiff must allege (1) there existed a valid contract with Millennium; (2) the Underwriters had knowledge of that contract; (3) the Underwriters intentionally procured the breach of the contract by Millennium; (4) Millennium actually breached the contract; and (5) Plaintiff suffered damages as a result.  *See Kirch v. Liberty Media Corp.*, 449 F.3d 377, 401, 402 (2d Cir. 2006) (citing *Lama Holding Co. v. Smith Barney Inc.*, 88 N.Y.2d 413, 424 (1996)). Intentional interference is a required element of a claim for tortious interference with contract; an interference that is "merely an intrusion that is negligent or incident to some other lawful purpose" is not enough.  *Zapin, Endlich & Lombardo v. CBS Coverage Group, Inc.*, 2005 N.Y. Slip Op. 52324U, at *4 (N.Y. Sup. Ct., N.Y. County 2005).

The Underwriters argue that Semple's tortious interference with contract claim fails on the first element because the LOI expressly provided that, with the exception of the Confidentiality and No Shop provisions, it was not intended to be a binding agreement.  Plaintiff argues that her claim is in fact premised on the No Shop provision, which was explicitly made a binding provision of the LOI.  It appears that Plaintiff's argument is premised on a misunderstanding of the express language of the No Shop provision.  That provision states that Semple "may not consummate a sale of the Shares to *a party other than Millennium* prior to the six month anniversary of the date [of the LOI], with the exception of a sale resulting from an exercise of [Eyeblaster's] right of first refusal." (emphasis added).  Semple's tortious interference with contract claim is premised on the failure of Millennium to consummate a purchase of shares, and has nothing to do with "any party other than Millennium."  Indeed, the No Shop provision imposes an obligation exclusively on Semple, and therefore it is not a provision that could form the basis of a tortious interference claim premised on Millennium's breach.  That is, Millennium could not have breached the No Shop clause of the LOI, because it had no obligations to do or refrain from doing anything under that provision.  Plaintiff's contention that her claim is based on the No Shop clause must be rejected. Rather, it is plain that Plaintiff's tortious interference with contract claim is based upon the Underwriters' alleged inducement of Millennium's refusal to enter into a contract to purchase shares of Eyeblaster stock.  However, no such claim may survive because the LOI makes clear on its face that it is not intended to be a binding agreement between the parties.  The LOI merely set forth the "basic understandings between [Semple] and Millennium, with respect to the proposed

6

Share Purchase." The document explicitly stated that "no term or provision of this [LOI] shall constitute a commitment, agreement or binding agreement on the part of [Semple] or [Millennium] with the exception of" two clauses that, as discussed above, have no bearing on Semple's claim.

To be sure, there are situations in which a letter of intent (or "agreement to agree") may be binding on the parties. *Adjustrite Sys., Inc. v. GAB Business Servs., Inc.*, 145 F.3d 543, 548 (2d Cir. 1998). However, as courts in this Circuit have consistently held, "[o]rdinarily when the parties contemplate further negotiations and the execution of a formal instrument, a preliminary agreement does not create a binding contract." *Cohen v. Lehman Brothers Bank, FSB*, 273 F. Supp. 2d 524, 527-28 (S.D.N.Y. 2003) (quoting *Adjustrite*, 145 F.3d at 548). A party that does not wish to be bound by a preliminary agreement may adopt language that makes it clear that there is no such intent. *See Teachers Ins. & Annuity Ass'n v. Tribute Co.*, 670 F. Supp. 491, 499 (S.D.N.Y. 1987) (Leval, J.). Here, that is precisely what Millennium did.[3]

Semple's alternative basis for her tortious interference with contract claim – that the Underwriters' actions of interference rendered her performance under the LOI impossible – is likewise without merit. Indeed, as Judge McMahon has noted, an assertion that a defendant is liable for a plaintiff's own breach of an agreement "is not the fact pattern contemplated by the tortious interference doctrine known as inducing breach of contract, since a plaintiff's own breach of contract cannot cause it any damage." *Lazar's Auto Sales, Inc. v. Chrysler Fin. Corp.*, 83 F. Supp. 2d 384, 391 (S.D.N.Y. 2000). Accordingly, the DBSI's motion to dismiss Semple's tortious interference with contract claim against the Underwriters is granted.

2. *Breach of Contract*

**Breach of the Lock-Up Agreement**

Semple's claim for breach of contract against the Underwriters is premised on their refusal to consent to her proposed sale of her restricted shares to Millennium. *See* Am. Compl. ¶¶ 71-73. Under New York law, a claim for breach of contract must allege (1) the existence of a contract; (2)

---

[3] Even if the LOI were an enforceable contract, Plaintiff's tortious interference with contract claim must nonetheless be dismissed because she has failed to allege any facts to show the Underwriters' intentional procurement of the breach. The extent of Plaintiff's allegations is that the Underwriters "induced Millennium to breach the [LOI]." Am. Compl. ¶ 51. She alleges no facts to suggest in what way the Underwriters induced such breach; indeed, there are no facts to suggest that the Underwriters ever had any contact with Millennium at all. Thus, Plaintiff's conclusory allegation that the Underwriters accomplished such an inducement is insufficient to survive dismissal. *See Masefield AG v. Colonial Oil Indus.*, 05 Civ. 2231 (PKL), 2006 U.S. Dist. LEXIS 5792, at *12-14 (S.D.N.Y. Feb. 15, 2006) (dismissing tortious interference with contract claim where conclusory allegation that defendant intentionally induced breach "lack[ed] any factual underpinnings"); *see also, e.g.*, *Sharma v. Skaarup Ship Mgmt.Corp.*, 916 F.2d 820, 828 (2d Cir. 1990) ("Intentional procurement of a breach is an essential element of the tort of interference with contractual relations. A plaintiff must allege that there would not have been a breach but for the activities of defendants.").

the plaintiff has performed her obligations under the contract; (3) the defendant failed to perform its obligations under the contract; and (4) the plaintiff suffered damages as a result. *Eternity Global Master Fund, Ltd. v. Morgan Guar. Trust Co. of N.Y.*, 375 F.3d 168, 177 (2d Cir. 2004).

Under the terms of the Lock-Up Agreement,[4] Semple "irrevocably agree[d] that, *without prior written consent of the Underwriters*, [she] will not, directly, or indirectly, . . . offer for sale, sell, pledge, or otherwise dispose of (or enter into any transaction or device that is designed to, or could be expected to, result in the disposition by any person at any time in the future of) any shares of Common Stock . . . or securities convertible into or exercisable or exchangeable for Common Stock." (emphasis added). The Underwriters argue that Semple's breach of contract claim fails under the second element, because she did not perform her own obligation under the Lock-Up Agreement to obtain the Underwriters' consent in writing *before* entering into any negotiations to sell her restricted shares. I agree. The language of the Lock-Up Agreement is clear: Semple was required to obtain prior written consent, and she did not do so. Rather, she entered into the LOI that set forth the material terms of a contemplated stock transfer agreement with Millennium, and then approached Lehman (allegedly acting on behalf of the Underwriters) for consent. Plaintiff's argument that she had not made the offer to sell to Millennium, but rather it was Millennium that approached her, is unavailing because the clear language of the Lock-Up Agreement provides that Semple was required to obtain prior written consent before "directly or indirectly . . . enter[ing] into any transaction or device that is designed to, or could be expected to, result in the disposition by any person at any time in the future of . . . any shares of Common Stock." The obligation to obtain prior written consent was not, therefore, contingent on Semple having made the first move in the negotiations. Because she failed to perform her clear obligation under the contract, the Underwriters cannot be held liable for breach of the Lock-Up Agreement.[5] *See, e.g.*, *Creditsights, Inc. v. Ciassullo*, No. 05 Civ. 9345 (DAB), 2008 WL 4185737, at *10

---

[4] In what appears to be an alternative theory of contract liability, the Amended Complaint alleges that "[a]t the time that Semple requested that she be released from the terms of the Lock-Up Agreement, the Underwriters knew that Eyeblaster did not intend to proceed with the IPO." Am. Compl. ¶ 71. Accepting this allegation as true for purposes of this motion, the communication by Eyeblaster to the Underwriters of its intent not to proceed with the IPO would have terminated the Lock-Up Agreement under the Release Contingency provision. If the Lock-Up Agreement was no longer in effect, Plaintiff would have been released from her obligations to obtain prior written consent from the Underwriters. Thus, it is hard to see how the Underwriters can be liable for breach of a terminated contract, when Plaintiff was no longer obligated to request consent for a transfer of the restricted shares. Thus, to the extent Semple's breach of contract claim is based on this alternative theory of liability, it must be dismissed.

[5] Plaintiff does allege that she "performed all of her obligations under the Lock-Up Agreement." Am. Compl. ¶ 70. However, the Court need not accept this allegation as true, as it is merely a "[c]onclusory allegation[] or legal conclusion[] masquerading as [a] factual conclusion[]." *Achtman v. Kirby, McInerney & Squire, LLP*, 464 F.3d 328, 337 (2d Cir. 2006).

(S.D.N.Y. Sept. 5, 2008) (dismissing breach of contract claim where counterclaim-plaintiff did not allege that he had obtained written consent of counterclaim-defendants before disclosing proprietary business information to third party as required under contract).

To the extent Semple attempts to circumvent this result by alleging that "any of her obligations under the Lock-Up Agreement that were not performed by her were waived," Am. Compl. ¶ 70, her attempt is unsuccessful. This alleged "waiver" ostensibly occurred when Semple's attorney was advised by counsel for Lehman that the Underwriters consented to release Semple from the Lock-Up Agreement. *Id.* ¶ 36. First, Plaintiff does not allege sufficient facts from which to conclude that this conversation between Lehman's counsel and her attorney in fact constituted a waiver. Waivers of contractual conditions are "not lightly presumed" and "the intent to waive must be unmistakenly manifested, and is not to be inferred from a doubtful or equivocal act." *Estate of Anglin v. Estate of Kelley*, 270 A.D.2d 853, 854 (4th Dep't 2000) (internal quotation marks and citations omitted). However, even if Plaintiff has sufficiently alleged that the Underwriters waived her obligation, it appears from the face of the Amended Complaint that they validly withdrew that waiver. As this Court previously has found, a waiver is not a binding agreement, and "can, to the extent that it is executory, be withdrawn, provided the party whose performance has been waived is given notice of the withdrawal and a reasonable time after notice within which to perform." *Blue Ridge Invs., LLC v. Anderson-Tully Co.*, No. 04 Civ. 3777 (HB), 2005 WL 44382, at *7 (S.D.N.Y. Jan. 10, 2005); *see also Bank Leumi Trust Co. of N.Y. v. Block 3102 Corp.*, 180 A.D.2d 588, 590 (1st Dep't 1992)(finding waiver is unilateral and may be withdrawn to the extent it is executory, as long as notice is given and there is no detrimental reliance or change of position on the part of the other party). Here, the allegations of the complaint clearly state that "when [Semple's attorney] contacted [Lehman's counsel] to finalize the documents releasing Semple from the terms of the Lock-Up Agreement . . . [he] advised [Semple's attorney] that the Underwriters were uncomfortable with the change and refused to release Semple." Am. Compl. ¶ 37. Thus, the Underwriters withdrew their alleged waiver while it remained executory (*i.e.*, it had not been finalized), and Semple has alleged no facts to suggest that there was any detrimental reliance on the initial waiver to prevent such withdrawal. Accordingly, insofar as Plaintiff's breach of contract claim is premised on the Underwriters' alleged breach of the express terms of the Lock-Up Agreement, that claim must be dismissed.

**Breach of the Implied Covenant of Good Faith and Fair Dealing**

Plaintiff also alternatively argues that the Underwriters breached the implied covenant of good faith and fair dealing by failing "to determine independently and in good faith whether a request to be released from the Lock-Up Agreement would be honored." Am. Compl. ¶ 74. It is well-settled that New York law recognizes an implied covenant of good faith and fair dealing in every contract. *E.g.*, *M/A-Com Sec. Corp. v. Galesi*, 904 F.2d 134, 136 (2d Cir. 1990). Under the implied covenant, "neither party to a contract shall do anything which has the effect of destroying or injuring the right of the other party to receive the fruits of the contract." *Thyroff v. Nationwide Mut. Ins. Co.*, 460 F.3d 400, 407 (2d Cir. 2006) (quoting *Galesi*, 904 F.2d at 136). The covenant "only applies where an implied promise is so interwoven into the contract as to be necessary for effectuation of the purposes of the contract." *Id.* (internal quotation marks and citation omitted). "Integral to a finding of a breach of the implied covenant is a party's action that directly violates an obligation that may be presumed to have been intended by the parties." *Galesi*, 904 F.2d at 136. The implied covenant, however, "does not extend so far as to undermine a party's general right to act on its own interests in a way that may incidentally lessen the other party's anticipated fruits from the contract." *Thyroff*, 460 F.3d at 408 (quoting *Galesi*, 904 F.2d at 136). Moreover, the implied covenant may "only impose an obligation consistent with other mutually agreed upon terms in the contract. It does not add to the contract a substantive provision not included by the parties." *Broder v. Cablevision Sys. Corp.*, 418 F.3d 187, 198-99 (2d Cir. 2005) (internal quotation marks and citations omitted); *see also JPMorgan Chase Bank, N.A. v. IDW Group, LLC*, 08 Civ. 9116 (PGG), 2009 U.S. Dist. LEXIS 9207, at *12 (S.D.N.Y. Feb. 9, 2009) ("An implied covenant of good faith and fair dealing, however, arises out of the known reasonable expectations of the other party which arise out of the agreement entered into. The covenant does not create duties which are not fairly inferable from the express terms of that contract.") (citation omitted).

While it is beyond peradventure that the covenant of good faith and fair dealing is implicit in every contract, yet "breach of that duty is merely a breach of the underlying contract." *Fasolino Foods Co. v. Banca Nazionale del Lavoro*, 961 F.2d 1052, 1056 (2d Cir. 1992). Thus, a complaint that raises both a breach of the contract and a breach of the implied covenant "is redundant, and courts confronted with such complaints . . . regularly dismiss any freestanding claim for breach of the covenant of fair dealing." *Jordan v. Verizon Corp.*, No. 08 Civ. 6414 (GEL), 2008 WL 5209989, at *7 (S.D.N.Y. Dec. 10, 2008); *see also, e.g.*, *Harris v. Provident Life & Accident Ins. Co.*, 310 F.3d 73, 83 (2d Cir. 2002) ("New York law . . . does not recognize a separate cause of

action for breach of the implied covenant of good faith and fair dealing when a breach of contract claim, based upon the same facts, is also pled."); *Aledia v. HSH Nordbank AG*, 08 Civ. 4342, 2009 U.S. Dist. LEXIS 24953, at *9 (S.D.N.Y. Mar. 25, 2009).

In this case, Semple's breach of implied covenant claim is based on the Underwriters' failure "to determine independently and in good faith whether a request to be released from the Lock-Up Agreement would be honored." Essentially, Semple's claim is based on the Underwriters' refusal to grant consent to her sale of restricted shares to Millennium, "an assertion factually identical to that contained in the breach of contract claim." *Simon v. Unum Group*, 07 Civ. 11426 (SAS), 2008 U.S. Dist. LEXIS 47719, at *16 (S.D.N.Y. June 19, 2008). Thus, Semple's breach of implied covenant claim "does not state a distinct cause of action based on a separate set of facts and so is not independent from the underlying breach of contract claim as required by New York law." *Id.* at *16-17. In addition, the duty that Semple claims is implied in the Lock-Up Agreement would be inconsistent with the express terms of the contract – under which Semple irrevocably agreed to obtain consent before entering into any agreement to sell her shares – and was not an obligation that was intended by the parties. *See Galesi*, 904 F.2d at 136. While the Underwriters' ultimate decision not to grant consent may have "incidentally lessen[ed] [Semple]'s anticipated fruits from the contract," *Thyroff*, 460 F.3d at 408, its decision to do so was not a breach of the implied covenant of good faith and fair dealing. Accordingly, the Underwriters' motion to dismiss this claim is granted.

C.     **Claims Against the Eyeblaster Defendants**

   1. *Tortious Interference with Contract*

Plaintiff's claim for tortious interference with contract against the Eyeblaster Defendants is based on two theories: (1) that Eyeblaster Defendants tortiously interfered with the Lock-Up Agreement with the Underwriters "by, among other things, demanding that the Underwriters withdraw their consent for the release of Semple from the Lock-Up Agreement," Am. Compl. ¶¶ 47-48; and (2) that Eyeblaster Defendants tortiously interfered with her Letter of Intent by engaging in the same conduct, *id.* ¶ 49. These claims must be dismissed. First, as discussed in detail above, Semple has not adequately alleged that the Underwriters breached the Lock-Up Agreement. As an actual breach by the third party is an essential element of a tortious interference with contract claim, this theory of liability fails. *See Kirch*, 449 F.3d at 401. Second, insofar as Semple's tortious interference with contract claim against the Eyeblaster Defendants is premised

11

on interference with the LOI with Millennium, it must fail because, as discussed in detail above, *see supra* Section III(B)(1), the LOI was not a valid enforceable contract. Accordingly, Plaintiff's tortious interference with contract claim against the Eyeblaster Defendants is dismissed.[6]

### 2. Tortious Interference with Business Relations

Semple's claim for tortious interference with business relations against the Eyeblaster Defendants is premised on the allegation that "[b]ut for the intentional, wrongful and malicious acts and interference of [the Eyeblaster Defendants], Millennium would have entered into or extended a contractual relationship with Semple." Am. Compl. ¶ 57. The conduct upon which this claim is based is that Firon sent an email to a representative of Millennium, warning him to stop soliciting Eyeblaster's employees to sell stock to Millennium. *Id.* ¶ 32.

To state a claim for tortious interference with business relations, Plaintiff must allege that (1) she had a business relationship with a third party; (2) the Eyeblaster Defendants knew of that relationship and intentionally interfered with it; (3) the Eyeblaster Defendants acted solely out of malice, or used dishonest, unfair or improper means; and (4) the interference caused injury to the business relationship. *State Street Bank & Trust Co. v. Inversiones Errazuriz Limitada*, 374 F.3d 158, 171 (2d Cir. 2004). Plaintiff must also allege that she "would have entered into an economic relationship but for the defendant's wrongful conduct." *Knight-McConnell v. Cummins*, 2004 WL 1713824, at *4 (S.D.N.Y. July 29, 2004) (quoting *Vigoda*, 293 A.D.2d at 266-67). That is, a claim for tortious interference with business relations applies in situations where, although no contractual relationship may yet exist, the plaintiff alleges that she would have entered into a contractual relationship with a third party, were it not for the wrongful acts of the defendant. Here, it is clear from the face of the Amended Complaint that Semple and Millennium had a business relationship, the Eyeblaster Defendants knew of that relationship, the Eyeblaster

---

[6] Semple alleges for the first time in her opposition to the motion to dismiss that the Lock-Up Agreement was orally modified when Lehman's counsel indicated that it would consent to her release from the Agreement. It is well-established that oral modifications of an agreement must be supported by consideration. *See, e.g.*, *Jofen v. Epoch Biosciences, Inc.*, 01 Civ. 4129 (JGK), 2002 U.S. Dist. LEXIS 12189, at *14 (S.D.N.Y. July 8, 2002); *Tierney v. Capricorn Investors, L.P.*, 189 A.D.2d 629, 631 (2d Dep't 1993). Partial performance may constitute sufficient consideration, so long as the partial performance is "unequivocally referable to the oral modification." *See Towers Charter & Marine Corp. v. Cadillac Ins. Co.*, 894 F.2d 516, 522 (2d Cir. 1990) (quoting *Rose v. Spa Realty Assocs.*, 42 N.Y.2d 338, 343 (1977)); *EMI Music Mktg. v. Avatar Records, Inc.*, 317 F. Supp. 2d 412, 421 (S.D.N.Y. 2004). However, Semple's allegations fail to illustrate sufficient partial performance on her part. For the doctrine of partial performance to apply, Semple must allege that she relied on the oral modification to her detriment in partially performing the contract. *See Richardson & Lucas, Inc. v. N.Y. Athletic Club of the City of N.Y.*, 304 A.D.2d 462, 463 (1st Dep't 2003). Here, the only part performance that is alleged is Semple's attorney contacting Lehman's counsel to "finalize" the release. This act was not a sufficient detriment to constitute part performance and the argument is insufficient to defeat the motion to dismiss.

Defendants interfered with it by approaching Millennium and instructing it to stop soliciting its employees, and the relationship thereby suffered injury. Semple also alleges that "but for" the interference, she would have entered into a contract with Millennium for the transfer of her shares.

The Second Circuit has recognized that "[t]he wrongful means requirement makes alleging and proving a tortious interference claim with business relations 'more demanding' than proving a tortious interference with contract claim." *Catskill Dev., L.L.C. v. Park Place Entm't Corp.*, 547 F.3d 115, 132 (2d Cir. 2008) (citing *Guard-Life Corp. v. S. Parker Hardware Mfg. Corp.*, 50 N.Y.2d 183, 191 (1980)). A defendant will be found to have acted with "malice" for the purposes of a tortious interference with business relations claim if he "engages in conduct for the sole purpose of inflicting intentional harm on plaintiffs." *Zikakis v. Staubach Retail Servs., Inc.*, 04 Civ. 9609 (NRB), 2005 U.S. Dist. LEXIS 21105, at *13 (S.D.N.Y. Sept. 26, 2005) (quoting *Carvel Corp. v. Noonan*, 3 N.Y.3d 182, 190 (2004)). For economic pressure to be wrongful for the purposes of this analysis, it must be "extreme and unfair." *Id.* at *15 (citations omitted).

Here, Plaintiff alleges that the Eyeblaster Defendants' conduct was wrongful because, after Firon informed her that Eyeblaster would not object to her contemplated sale with Millennium, he turned around and tried to induce Millennium to back out of its deal with Semple. Am. Compl. ¶¶ 30, 32. Semple also alleges that, but for the Eyeblaster Defendants' unjustified interference with her prospective relationship with Millennium, she would have entered into a final agreement for the sale of her shares to Millennium based on the agreed-to terms in the LOI. Id. ¶ 57. The Amended Complaint sufficiently alleges that this action was taken for the purpose of harming Semple, for example because the Eyeblaster Defendants knew that Semple was not financially capable of exercising her options in the absence of the contract with Millennium, and knowing that the IPO would not go forward, the Company preferred to keep its stock closely held. See id. ¶ 33. Under the liberal pleading standards engendered by the Federal Rules, these allegations are sufficient to survive the Eyeblaster Defendants' motion to dismiss. Accordingly, the Eyeblaster Defendants' motion to dismiss Semple's claim for tortious interference with business relations is denied.

### 3. Breach of Contract

Semple's claim for breach of contract against the Eyeblaster Defendants is premised on Eyeblaster's breach of the implied covenant of good faith and fair dealing by "refus[ing] to allow Semple to exercise her vested Eyeblaster options" and "engineering the withdrawal of the Underwriters' consent for the release of Semple from the Lock-Up Agreement." *See* Am. Compl.

13

¶ 64-66. The Eyeblaster Defendants argue that this claim is unsupported by sufficient factual allegations and is refuted by other allegations in the complaint that indicate Eyeblaster actually helped Semple exercise her options by advising her that she needed the Underwriters' consent before she could sell her stock and by extending the deadline by which her options would expire. As numerous courts in this Circuit have found, the appropriate question on a motion to dismiss is not whether the plaintiff ultimately will prevail on her claim, but whether she has pled sufficient factual allegations to support the claim in the first instance. *See, e.g.*, *Alie v. NYNEX Corp.*, 158 F.R.D. 239 (E.D.N.Y. 1994) (citing *Scheuer v. Rhodes*, 416 U.S. 232, 236 (1974)). Thus, "[t]he court's function . . . is not to weigh the evidence that might be presented at trial but merely to determine whether the complaint itself is legally sufficient." *Condit v. Dunne*, No. 06 Civ. 13126, 2008 WL 2676306, at *2 (S.D.N.Y. July 8, 2008) (quoting *Festa v. Local 3 Int'l Bhd. of Elec. Workers*, 905 F.2d 35, 37 (2d Cir. 1990)) (ellipsis in original). Hence, although the Eyeblaster Defendants argue that the "factual predicate for plaintiff's third cause of action is false" based on the "documentary evidence," this argument rides roughshod over the unquestionable principle that all allegations must be taken as true for the purposes of a motion to dismiss.[7]

As already noted, there is no claim for breach of the implied covenant of good faith and fair dealing that is inconsistent with the terms of the contract itself. *See, e.g.*, *Broder*, 418 F.3d at 198-99. "New York courts do, however, recognize a separate cause of action for breaches of the covenant of good faith and fair dealing in cases involving efforts by one party to a contract to subvert the contract itself." *Kermanshah*, 580 F. Supp. 2d at 272. Here, the Amended Complaint sufficiently alleges that Semple had a contract under which she was entitled to exercise certain vested options to purchase shares of Eyeblaster stock, and that Eyeblaster acted so as to prevent her from exercising those options under the contract. Taking these allegations as true, Plaintiff has sufficiently pled an independent claim for breach of the implied covenant of good faith and fair dealing. *See Thyroff*, 460 F.3d at 407; *see also Richmond Shop Smart, Inc. v. Kenbar Dev. Ctr.*, 32 A.D.3d 423, 424 (2d Dep't 2006) (finding plaintiff sufficiently alleged breach of implied covenant of good faith and fair dealing when defendant's "actions allegedly frustrated the rights

---

[7] Indeed, the very statement that the Defendants claim was helpful to Plaintiff – that she was required to obtain consent from the Underwriters before entering into a contract with Millennium – also forms the basis of a principal allegation of fraud, as discussed further below. On a motion to dismiss, the Court must draw all inferences in favor of the Plaintiff, and may not make any finding on which of these interpretations will ultimately be shown to be correct.

and reasonable expectations of the plaintiff under the [contract]"). Accordingly, the Eyeblaster Defendants' motion to dismiss this claim is denied.[8]

### 4. *Fraud*

The gravamen of Semple's fraud claim is that despite the fact that the Eyeblaster Defendants knew that Semple was anxious to exercise her options and, too, that the company did not intend to proceed with the IPO, they intentionally misrepresented to Semple that she could not exercise those options without first obtaining a release from the Lock-Up Agreement from the Underwriters. *See* Am. Compl. ¶¶ 78-79. That is, Plaintiff contends that because Eyeblaster no longer intended to go forward with the IPO, and had informed the Underwriters of that fact, the Lock-Up Agreement had terminated by its own terms under the Release Contingency provision. Consequently, Plaintiff alleges, she was no longer required to obtain the Underwriters' consent under the Lock-Up Agreement, and Eyeblaster's instruction that she was required to do so was in fact false. Semple alleges that she relied on this representation to her detriment by following Eyeblaster's instruction and approaching the Underwriters for consent that in fact she did not need, all the while running out the clock on her time to exercise her options. Further, Semple alleges that Firon informed her that Eyeblaster had no objection to her sale of Eyeblaster stock to Millennium, but that this was a false representation, Firon having expressly directed the Underwriters to withdraw their consent to release Semple from the Lock-Up Agreement. *Id.* ¶¶ 80-81.

Allegations of fraud must be pled with particularity. Fed. R. Civ. P. 9(b). The Second Circuit has held that "[t]o satisfy the particularity requirement of 9(b), a complainant must adequately specify the statements it claims were false or misleading, give particulars as to the respect in which plaintiff contends the statements were fraudulent, state when and where the statements were made, and identify those responsible for the statements." *Cosmas*, 886 F.2d at 11.

---

[8] The Eyeblaster Defendants alternatively argue that the breach of contract claim should be dismissed for improper venue, pursuant to a forum selection clause of an Award Agreement that, concurrently with the Stock Purchase Plan, governed the terms and conditions of Semple's exercise of vested stock options. *See* Declaration of Maureen A. McGovern, Exh. C. The Award Agreements provide that "[e]xclusive venue in any legal proceeding under, or in connection with, this agreement or the transactions contemplated hereby shall be in any federal or state courts of the State of Delaware." *Id.* at § 9.2. However, this argument is unavailing, as the Award Agreement terminated upon Semple's termination of her employment with Eyeblaster in April 2008. *See id.* at 2. The Award Agreement was expressly conditioned on Semple's continued employment at least one year after the Date of Grant, defined as October 9, 2007. *Id.* When Semple resigned less than one year after the Date of Grant, the Award Agreement terminated. Thus, Semple's breach of contract claim is premised exclusively on the Stock Purchase Plan, which contains no forum selection clause. Consequently, the Eyeblaster Defendants' motion to dismiss for improper venue is denied. Indeed, it appears that the Eyeblaster Defendants have all but conceded this result, as they raise no such contention in their reply papers.

Here, Plaintiff has sufficiently stated the "where, when, who and how" of the allegedly fraudulent statements. She alleges that in early July 2008, Firon told her (1) that she was required to be released from the Lock-Up Agreement and (2) that Eyeblaster would not object to her sale of shares to Millennium. She alleges that these statements were false because Firon and Eyeblaster knew that Eyeblaster would no longer proceed with the IPO, and thus a release was not required under the Lock-Up Agreement; in addition, the statement as to Eyeblaster's lack of objection to the contemplated sale was sufficiently alleged to have been false as illustrated by Firon's contemporaneous warning to Millennium to cease soliciting Eyeblaster employees. The Amended Complaint further alleges that the Eyeblaster Defendants "did not want other Eyeblaster employees to understand that they could, through outside sources such as Millennium, obtain the liquidity they required to exercise their vested Eyeblaster options." Am. Compl. ¶ 39. Taken as true, as they must be, these allegations state with sufficient particularity the circumstances underlying the Eyeblaster Defendants' alleged fraud. Further, Semple has sufficiently pled that the Eyeblaster Defendants had motive and opportunity to commit fraud to survive a motion to dismiss on the scienter element of her fraud claim. Accordingly, the motion to dismiss the fraud claim is denied.

## IV.  CONCLUSION

For the foregoing reasons, all claims against the Underwriters are dismissed.[9] Plaintiff's claim against the Eyeblaster Defendants for tortious interference with contract is also dismissed. Plaintiff has now had two opportunities to plead her claims; therefore, no leave to amend shall be granted. *See, e.g.*, *Tabor v. Bodisen Biotech, Inc.*, 579 F. Supp. 2d 438, 454-55 (S.D.N.Y. 2008); *United Magazine Co. v. Murdoch Magazines Distrib.*, 00 Civ. 3367 (AGS), 2003 U.S. Dist. LEXIS 1440, at *12 (S.D.N.Y. Feb. 3, 2003). Indeed, this Court already has stated that the Amended Complaint was Semple's "last effort and if [Defendants] prevail on [the] motion there will be no further opportunity to respond." *See* Letter Endorsement dated January 20, 2009 (Docket No. 24). As to the balance of Plaintiff's claims – for interference with business relations,

---

[9] As noted earlier, Lehman is not a party to DBSI's motion due to the automatic stay in its bankruptcy proceedings. However, each of the arguments put forth by DBSI applies equally to Lehman, as does each of Plaintiff's factual allegations concerning the Underwriters. Semple has had ample notice and opportunity to be heard on the issue of the sufficiency of her allegations against both Underwriters, both in the form of a memorandum of law in opposition to the motion to dismiss, and in oral argument before the Court. Accordingly, I will dismiss the claims against Lehman *sua sponte*. *See Wachtler*, 35 F.3d at 82; *In re Parmalat Secs. Litig.*, 377 F. Supp. 2d at 415 n.166; *Winstar Comm'ns*, 2005 U.S. Dist. LEXIS 42508 at *14.

breach of contract and fraud – the Eyeblaster Defendants' motion to dismiss is denied. The Clerk of this Court is directed to close all open motions in this matter.

**IT IS SO ORDERED.**

New York, New York
May 26, 2009

_____
U.S.D.J.