UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------------------x
ELIZABETH SEMPLE,                                  :
                                                   :
                        Plaintiff,           :        08 Civ. 9004 (HB)
                                                   :
        -against-                                :        OPINION & ORDER
                                                   :
EYEBLASTER, INC., and GAL TRIFON,                  :
                                                   :
                        Defendants.         :
------------------------------------------------------------------------x

**Hon. HAROLD BAER, JR., United States District Judge:**

        Plaintiff Elizabeth Semple ("Plaintiff" or "Semple") filed an Amended Complaint on January 20, 2009, alleging various causes of action against her former employer Eyeblaster, Inc. ("Eyeblaster"), its Chief Executive Officer Gal Trifon ("Trifon") (collectively, the "Eyeblaster Defendants"), Lehman Brothers, Inc. ("Lehman") and Deutsche Bank Securities Inc. ("DBSI") (collectively, the "Underwriters") arising out of her inability to exercise her options to purchase Eyeblaster stock. All Defendants moved to dismiss the claims against them. In an Opinion and Order dated May 26, 2009, this Court granted the Underwriters' motion to dismiss in its entirety, and granted the Eyeblaster Defendants' motion to dismiss in part. Defendants now move for summary judgment on each of the remaining claims against them. The remaining claims are for (1) tortious interference with business relations; (2) breach of contract; and (3) fraud. For the reasons set forth below, Defendants' motion is granted in part and denied in part.

## I. FACTUAL BACKGROUND[1]

        Semple was employed as the Vice President for Global Human Resources at Eyeblaster from March 21, 2005 to April 20, 2008. As part of her compensation, Semple was awarded options to purchase Eyeblaster stock, subject to the terms of Eyeblaster's Third Amended and Restated Stock Option and Incentive Plan (the "2001 Plan") and Eyeblaster's 2007 Stock Option and Incentive Plan (the "2007 Plan"). By the time Semple left the company, 26,868 of her stock options had vested; the deadline to exercise those options was July 18, 2008.

---

[1] The facts underlying Plaintiff's claims were discussed in detail in this Court's Order of May 26, 2009 that addressed the parties' motions to dismiss, and are largely undisputed. *See Semple v. Eyeblaster, Inc.*, No. 08 Civ. 9004, 2009 WL 1457163, at *1-3 (S.D.N.Y. May 26, 2009). The reader's familiarity with the facts of this case will therefore be presumed, and the facts will be repeated here only to the extent necessary to resolve the instant motion.

In approximately November 2007, Eyeblaster began preparations for an initial public offering ("IPO") of its stock on the NASDAQ stock exchange. Lehman and DBSI were engaged to act as lead underwriters of the IPO; however, the underwriting agreement between Eyeblaster and the Underwriters was never fully executed. In connection with the contemplated IPO, the Underwriters and Semple entered into a letter agreement pursuant to which Semple agreed, among other things, to obtain prior written consent of the Underwriters before she entered any agreement to sell or otherwise dispose of any stock that she would obtain by exercising her options (the "Lock-Up Agreement").[2] The Lock-Up Agreement stated that the consideration for Semple's promises were "the execution of the Underwriting Agreement by the Underwriters, and . . . other good and valuable consideration." The Lock-Up Agreement further provided that Semple would be released from her obligation to obtain prior written consent if: (1) Eyeblaster notifies the Underwriters that it does not intend to proceed with the IPO; (2) the Underwriting Agreement does not become effective by December 31, 2008; or (3) the Underwriting Agreement terminates before payment for and delivery of the Stock (the "Release Contingency provision").

On June 30, 2008, without prior written consent from the Underwriters, Plaintiff executed a non-binding letter of intent (the "LOI") with Millennium Technology Value Partners, L.P. ("Millennium"), a private equity company, indicating her intent to sell to Millennium 23,868 shares of Eyeblaster common stock that she was to receive from the exercise of her options. On July 3, 2008, Semple forwarded to Eyeblaster a copy of the LOI and a Notice of Proposed Transfer in which she provided notice of her intent to transfer these shares to Millennium. The next day, Eyeblaster advised Plaintiff that the Lock-Up Agreement required the consent of the Underwriters and until consent was obtained, the Lock-Up Agreement prohibited the proposed transaction with Millennium. On July 7, 2008, Semple received an email from Eyeblaster's counsel that advised her that the Lock-Up Agreement remained in effect, and that Eyeblaster would decline to transfer any Eyeblaster stock to Millennium without a waiver from the Underwriters, as any such transfer would be in violation of the Lock-Up Agreement. On the same day, Eyeblaster's chief financial officer, Sarit Firon, sent an email to Millennium that advised that by soliciting Eyeblaster employees to sell their stock, Millennium induced the employees to breach their Lock-Up Agreements, and stated that Eyeblaster reserved all rights to take all appropriate legal action against Millennium if it did not cease and desist such solicitation.

---

[2] Several other Eyeblaster employees who were entitled to Eyeblaster stock options also entered into substantially identical Lock-Up Agreements with the Underwriters.

Based on Eyeblaster's advice that Semple would not be able to transfer her shares to Millennium absent a waiver of the Lock-Up Agreement by the Underwriters, Semple retained counsel, Renee Eubanks, to assist her in obtaining the releases. Eubanks contacted Colin Diamond, counsel for the Underwriters, who told her that Lehman would agree to provide the waiver, subject to Millennium's agreement to be bound by the Lock-Up Agreement. However, before the waiver was officially granted, Trifon discussed Plaintiff's request for a release with Paul Inouyne of Lehman and expressed his reservations regarding the request and indicated that Eyeblaster would prefer if the waiver were not granted. Defendants contend that Eyeblaster's position was based on its concerns about the continued viability of the company's use of the stock option plan as an employee retention tool. That is, Defendants' contend that the stock option plan would be essentially worthless to encourage employee retention if Eyeblaster employees simply could obtain funds necessary to exercise their options from a third-party funding source such as Millennium. On July 18, 2008, the Underwriters advised Semple that her request for a waiver of the Lock-Up Agreement would not be honored. However, on Semple's request, Eyeblaster granted an extension to August 20, 2008 for her to exercise her options. On approximately July 21, 2008, Semple had a conversation with Trifon in which she requested that he allow the release from the Lock-Up Agreement, but Trifon advised Semple that he would not consent to the release. Ultimately, Millennium withdrew from its deal with Semple, and she did not exercise any of her options before they expired.

## II.  DISCUSSION

**A.        Legal Standard on a Motion for Summary Judgment**

A motion for summary judgment must be granted if the moving party shows "there is no genuine issue as to any material fact" and it "is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). In considering a motion for summary judgment, the Court must view the evidence in the light most favorable to the non-moving party. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986). Summary judgment should be granted "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). In showing the existence of a genuine issue of material fact, "the non-moving party may not rely on mere conclusory allegations nor speculation," *Golden Pac. Bancorp v. F.D.I.C.*, 375 F.3d 196, 200 (2d Cir. 2004), nor can it rely on mere denials or unsupported alternative

explanations of its conduct, *see SEC v. Grotto*, No. 05 Civ. 5880 (GEL), 2006 WL 3025878, at *7 (S.D.N.Y. Oct. 24, 2006). Rather, it "must come forward with evidence sufficient to allow a reasonable jury to find in [its] favor." *Brown v. Henderson*, 257 F.3d 246, 252 (2d Cir. 2001); *see also* Fed. R. Civ. P. 56(e).

### B. Enforceability of the Lock-Up Agreement

Plaintiff's principal argument, on which all of her contentions in opposition to summary judgment hinge, is that the Lock-Up Agreement was unenforceable as a matter of law because, as she learned in discovery, the underwriting agreement between Eyeblaster and the Underwriters, referenced in the Lock-Up Agreement, was never executed. Accordingly, Plaintiff argues that the Lock-Up Agreement was ineffective for lack of consideration, and there was therefore no basis for Defendants to refuse to honor her request to transfer her shares to Millennium.

Plaintiff's arguments in this regard must be rejected for two reasons, both of them premised on the express language of the Lock-Up Agreement itself.[3] First, the Lock-Up Agreement specifically provided that Semple agreed to the restrictions contained in the agreement "[i]n consideration of the execution of the Underwriting Agreement by the Underwriters, *and for other good and valuable consideration*." The language of this provision is unambiguous, and Plaintiff has proffered no facts to suggest that, even if the Underwriting Agreement had not been executed, she did not receive "other good and valuable consideration" in exchange for entering into the Lock-Up Agreement.[4] Second, the express language of the Lock-Up Agreement makes

---

[3] In the interest of completeness, I address here the merits of Plaintiff's contentions as to the validity of the Lock-Up Agreement. However, it is important to note that Plaintiff never pled any such deficiency, and this Court has expressly denied her request for leave to amend the complaint in order to do so. *See* Opinion & Order, dated June 19, 2009 (Docket No. 59). Under the Pretrial Scheduling Order to which all parties and the Court agreed, the time for amendments has long since come and gone. Plaintiff cannot now seek to amend her pleading through arguments advanced in her opposition to summary judgment. *See, e.g.*, *Wright v. Ernst & Young LLP*, 152 F.3d 169, 178 (2d Cir. 1998) (finding a "party may not amend [its] pleading through statements in [its] briefs"); *Olde Monmouth Stock Transfer Co. v. Depository Trust & Clearing Corp.*, 485 F. Supp. 2d 387, 393 (S.D.N.Y. 2007) ("[I]t is long-standing precedent in this circuit that parties cannot amend their pleadings through issues raised solely in their briefs.") (quoting *Fadem v. Ford Motor Co.*, 352 F. Supp. 2d 501, 516 (S.D.N.Y. 2005)).

[4] As a general rule, the adequacy of consideration is not the proper subject of judicial scrutiny. *See, e.g.*, *Ferguson v. Lion Holding, Inc.*, 312 F. Supp. 2d 484, 495 (S.D.N.Y. 2004); *Apfel v. Prudential-Bache Secs. Inc.*, 81 N.Y.2d 470, 476 (1993). That is, "[s]o long as the consideration is acceptable to the promisee a court need not look to the value of the things promised." *Rojo v. Deutsche Bank*, No. 06 Civ. 13574 (LBS), 2008 U.S. Dist. LEXIS 94007, at *12 (S.D.N.Y. Nov. 5, 2008). Accordingly, the New York Court of Appeals has acknowledged that, "[u]nder the traditional principles of contract law, the parties to a contract are free to make their bargain, even if the consideration exchanged is grossly unequal or of dubious value." *Apfel*, N.Y.2d at 475; *see also Caisse Nationale de Credit Agricole-CNCA v. Valcorp, Inc.*, 28 F.3d 259, 265 (2d Cir. 1994) ("It is well established that the slightest consideration is sufficient to support the most onerous obligation and that the courts are not to inquire into the adequacy of consideration.")(internal quotation and citation omitted); *Weiner v. McGraw-Hill, Inc.*, 57 N.Y.2d 458,

clear that the parties contemplated and acknowledged the fact that the Underwriting Agreement had not yet been finalized. Indeed, the first sentence of the Lock-Up Agreement provides that certain firms "propose[d] to enter into an Underwriting Agreement." Further, the Lock-Up Agreement provided that "[a]ny Offering will only be made pursuant to an Underwriting Agreement, *the terms of which are subject to negotiation* between [Eyeblaster] . . . and the Underwriters." Finally, the Lock-Up Agreement expressly contemplated that the Underwriting Agreement was not yet effective*,* as it provided that Semple would be released from her obligation to obtain prior written consent if, among other things, the Underwriting Agreement did not become effective by December 31, 2008. Accordingly, Plaintiff has not sustained her burden to show that the Lock-Up Agreement was unenforceable as a matter of law simply because the Underwriting Agreement was not yet executed.

## C.     Tortious Interference with Business Relations

To prevail on a claim for tortious interference with business relations, Plaintiff must establish that (1) she had a business relationship with a third party; (2) the Eyeblaster Defendants knew of that relationship and intentionally interfered with it; (3) the Eyeblaster Defendants conduct amounted to "wrongful means;" and (4) the interference caused injury to the business relationship. *See Catskill Dev., L.L.C. v. Park Place Entm't Corp.*, 547 F.3d 115, 132 (2d Cir. 2008). Plaintiff must also show that she "would have entered into an economic relationship but for the defendant's wrongful conduct." *Knight-McConnell v. Cummins*, 2004 WL 1713824, at *4 (S.D.N.Y. July 29, 2004) (citation omitted). Here, it is undisputed that Semple and Millennium had a business relationship, the Eyeblaster Defendants knew of that relationship, the Eyeblaster Defendants interfered with it by insisting that Millennium cease and desist in its solicitation of Eyeblaster employees, and the relationship thereby suffered injury. It is also apparently undisputed that, but for the interference through Eyeblaster's email demanding that Millennium cease in its solicitation of Eyeblaster's employees, Semple and Millennium would have entered into a contract for the purchase of Semple's shares of Eyeblaster stock. Thus, three of the prongs are satisfied and all that remains is whether Semple has raised a genuine issue of material fact as to

---

464 (1982) ("Far from consideration needing to be coextensive or even proportionate, the value or measurability of the thing forborne or promised is not crucial so long as it is acceptable to the promisee."). In this case, Plaintiff freely entered into the Lock-Up Agreement, and her promise was supported by "good and valuable consideration," such as, for example, the Underwriters' continuing performance in preparation for the IPO, which provided a substantial benefit to Plaintiff, i.e., the creation of a public market for the sale of Eyeblaster shares. Furthermore, it is well established that consideration may be considered adequate when it benefits a third party, rather than the person who agreed to it. *Weiner*, 57 N.Y.2d at 464-65. There can be no doubt that the benefit of the Underwriters' performance in effectuating the IPO inured to Eyeblaster, a third-party to the Lock-Up Agreement.

whether the Defendants' conduct amounted to the "wrongful means" necessary to support a claim for tortious interference.

The Second Circuit has recognized that "[t]he wrongful means requirement makes alleging and proving a tortious interference claim with business relations 'more demanding' than proving a tortious interference with contract claim." *Catskill Dev.*, 547 F.3d at 132 (citing *Guard-Life Corp. v. S. Parker Hardware Mfg. Corp.*, 50 N.Y.2d 183, 191 (1980)). To satisfy that prong of the test, i.e., "wrongful means," "one of the following must be true: (1) that conduct must amount to an independent crime or tort; or (2) that conduct must have been taken solely out of malice;[5] or (3) that conduct must amount to 'extreme and unfair' economic pressure." *Friedman v. Coldwater Creek, Inc.*, 551 F. Supp. 2d 164, 170 (S.D.N.Y. 2008), *aff'd*, 2009 U.S. App. LEXIS 7514 (2d Cir. Apr. 8, 2009). The wrongful conduct must have been directed not at the plaintiff, but at the third party with which the plaintiff has or seeks to have a relationship. *Carvel*, 3 N.Y.3d at 192. That is, in this case we look to the conduct that was directed at Millennium, not Semple.

Here, Plaintiff advances two arguments to support her contention that Defendants acted with sufficient "wrongful means." First, Plaintiff argues that Defendants' statements to Millennium advising it that its actions in soliciting the Semple shares amounted to inducement of a breach of the Lock-Up Agreement and as such constituted an independent tort because the Lock-Up Agreement was invalid, and also because they constituted vexatious threats of litigation against Millennium. This argument fails because, as discussed above, the Lock-Up Agreement was in full force and effect, and therefore it was no misrepresentation for Eyeblaster to advise Millennium that any sale of the shares was subject to a waiver from the Underwriters. Moreover, even if these statements somehow could be interpreted as misrepresentations, such misrepresentations alone are insufficient to amount to "wrongful means." *See, e.g.*, *Friedman*, 551 F. Supp. 2d at 171; *Berwick v. New World Network Int'l, Ltd.*, 06 Civ. 2641 (JGK), 2007 U.S. Dist. LEXIS 22995, at *46 (S.D.N.Y. Mar. 28, 2007). Further, even if Eyeblaster's reservation of its rights to pursue legal action could be construed as a threat of civil litigation, such threats cannot form the basis of a tortious interference with business relations claim unless the claim is patently frivolous. *See Pagliaccio v. Holborn Corp.*, 289 A.D.2d 85, 85 (1st Dep't 2001); *see also Universal City Studios, Inc. v. Nintendo Co.*, 797 F.2d 70, 75 (2d Cir. 1986); *Gucci Am., Inc. v.*

---

[5] A defendant will be found to have acted with sufficient "malice" for the purposes of a tortious interference with business relations claim if he "engages in conduct for the sole purpose of inflicting intentional harm on plaintiffs." *Zikakis v. Staubach Retail Servs., Inc.*, 04 Civ. 9609 (NRB), 2005 U.S. Dist. LEXIS 21105, at *13 (S.D.N.Y. Sept. 26, 2005) (quoting *Carvel Corp. v. Noonan*, 3 N.Y.3d 182, 190 (2004)).

*Exclusive Imps. Int'l*, 99 Civ. 11490 (RCC), 2007 U.S. Dist. LEXIS 19532, at *22-23 (S.D.N.Y. Mar. 19, 2007). Plaintiff also fails to raise a genuine issue of material fact as a consequence of Defendants' reservation of rights to pursue future litigation if Millennium chose to proceed with its solicitation of Eyeblaster employees.[6]

Plaintiff also argues that there is a genuine issue of material fact as to whether Defendants acted solely with the purpose to harm Plaintiff. Defendant argues that summary judgment is warranted because its interference with the Millennium deal was driven by a legitimate business purpose. Specifically, Defendants contend that, from a business and economic perspective, Eyeblaster was concerned about Plaintiff's proposed transaction with Millennium because it had the potential to lessen the value of the company, and also threatened Eyeblaster's ability to use the stock option plan as a retention tool. It is well-settled that where a party acts, at least in part, in accordance with its normal economic self-interest, it cannot be found to have acted *solely* out of malice for the purpose of a tortious interference claim. *See Carvel*, 3 N.Y.3d at 190; *Jim Mazz Auto, Inc. v. Progressive Cas. Ins. Co.*, 08-CV-00494(A)(M), 2009 U.S. Dist. LEXIS 31945, at *21 (W.D.N.Y. Feb. 5, 2009) ("A motive of 'normal economic self-interest' is inconsistent with a sole purpose of inflicting intentional harm.") (quoting *Hassan v. Deutche Bank A.G.*, 515 F. Supp. 2d 426, 430 (S.D.N.Y. 2007)). Plaintiff argues that Eyeblaster had no policy in place that established the stock options as a retention tool, and that the timing of Eyeblaster's interference – just before the time for Plaintiff to exercise her options was to expire – shows that the only reason for Eyeblaster's interference was that Trifon was "upset that [Semple] had entered the LOI without discussing it with him first." These arguments are insufficient to raise any question as to the legitimacy of Defendants' proffered motives for their conduct. Plaintiff's own deposition testimony also undercuts her argument, as she acknowledged that there were "a lot of reasons" for Defendants' acting to prevent the Underwriters from releasing her from the Lock-Up Agreement, including that to do so would lessen the value of the company, and that the options plan was used for employee retention. *See* Deposition of Elizabeth Semple ("Semple Dep.") at 238-39, 277-78, 285. Thus, even if Plaintiff is correct in contending that Trifon was "upset" with her, this would

---

[6] Plaintiff also argues that because Eyeblaster was not a party to the Lock-Up Agreement, Firon's reference to the contract as "our" (*i.e.*, Eyeblaster's) contracts in her email to Millennium was false and therefore constitutes independent tortious conduct sufficient to sustain the tortious interference claim. Plaintiff's argument must fail because, as noted above, even if this statement were a misrepresentation, it could not be *per se* "wrongful." *See Friedman*, 551 F. Supp. 2d at 171. Furthermore, Plaintiff's argument turns on a strained reading of the email, which expressly states that the Lock-Up Agreement was entered into between employees and the underwriters, and does not purport to name Eyeblaster as a party to any agreement.

establish merely one purpose, and not the sole purpose, for Eyeblaster's conduct. Accordingly, Plaintiff has failed to raise any genuine issue of material fact as to whether Defendants acted solely with malice in inducing the Underwriters not to release Plaintiff from the Lock-Up Agreement. Defendants' motion for summary judgment on Plaintiff's claim for tortious interference with business relations is granted.

### D.     Breach of Contract

Plaintiff argues that Defendants breached the terms of the Eyeblaster Stock Option Plan because, although Plaintiff had complied with all of her obligations under the Plan to provide Eyeblaster with the necessary paperwork and the opportunity to exercise its right of first refusal, Eyeblaster refused to allow Millennium to provide the funds within which to exercise the options. Plaintiff contends that, because the Lock-Up Agreement was invalid, Defendants had no right under the Stock Option Plan to refuse her the opportunity to exercise her options. Thus, Plaintiff's entire argument is premised on the contention that the Lock-Up Agreement was invalid and that she was therefore never under the obligation to obtain consent from the Underwriters. This argument has been rejected, as discussed in detail above. As Plaintiff proffers no other facts that she contends present at triable issue of fact on her claim for breach of contract, Defendants' motion for summary judgment on that claim is granted.

### E.     Breach of the Implied Covenant of Good Faith and Fair Dealing

Semple's claim for breach of the implied covenant of good faith and fair dealing is premised on Defendants' "refusal to allow Semple to exercise her vested Eyeblaster options" and "engineering the withdrawal of the Underwriters' consent for the release of Semple from the Lock-Up Agreement." *See* Am. Compl. ¶ 64-66. It is well-settled that New York law recognizes an implied covenant of good faith and fair dealing in every contract. *E.g.*, *M/A-Com Sec. Corp. v. Galesi*, 904 F.2d 134, 136 (2d Cir. 1990). Under the implied covenant, "neither party to a contract shall do anything which has the effect of destroying or injuring the right of the other party to receive the fruits of the contract." *Thyroff v. Nationwide Mut. Ins. Co.*, 460 F.3d 400, 407 (2d Cir. 2006) (quoting *Galesi*, 904 F.2d at 136). However, the implied covenant may "only impose an obligation consistent with other mutually agreed upon terms in the contract. It does not add to the contract a substantive provision not included by the parties." *Broder v. Cablevision Sys. Corp.*, 418 F.3d 187, 198-99 (2d Cir. 2005) (internal quotation marks and citations omitted).

In this case, although Eyeblaster was not a party to the Lock-Up Agreement, it was obligated to decline to "make any transfer of securities if such transfer would constitute a violation

8

or breach of the Lock-Up Agreement." It is apparently undisputed that if, as the Court has found, the Lock-Up Agreement was in full force and effect, the proposed transaction between Semple and Millennium would have violated its terms. Accordingly, Defendants were prevented by the Lock-Up Agreement from transferring Semple's shares to Millennium, unless the Underwriters consented to release Semple from its terms. Thus, Defendants' refusal to transfer the shares and concomitant advice to Semple that the Lock-Up Agreement required her to obtain consent from the Underwriters did not itself constitute a breach of the implied covenant of good dealing. However, Defendants' actions did not end at their refusal to transfer the shares; rather, after advising Semple that she was required to obtain the Underwriters' consent, Defendants proceeded to attempt to convince the Underwriters to withhold that consent. Plaintiff has provided record evidence that the Underwriters were, at least preliminarily, inclined to okay Semple's release from the Lock-Up Agreement, but that they ultimately did not consent, purportedly based on machinations by the Defendants. The only thing standing in Semple's way before she could exercise her shares using funds obtained from Millennium was the Underwriters' consent to the Millennium deal; thus, if the Underwriters had granted consent to release Semple, Defendants would had no discretion with respect to Semple's ability to exercise her options, irrespective of whether it was she or a third-party source who provided the funding with which to exercise them. That is, Eyeblaster would have been obligated under the Stock Option Plan to allow Semple to exercise her options and to allow the transfer of the Eyeblaster shares to Millennium. Accordingly, there is a genuine issue of material fact as to whether by convincing the Underwriters to withhold their consent, Defendants acted in a way so as to interfere with Semple's right to enjoy the benefits of the Stock Option Plan. Thus, the Defendants' motion for summary judgment on Plaintiff's claim for breach of the implied covenant of good faith and fair dealing is denied.

**F.      Fraud**

To succeed on a claim for fraud, a plaintiff ultimately must prove (1) a misrepresentation or an omission of material fact which was false and known to be false by the defendant, (2) the misrepresentation was made for the purpose of inducing the plaintiff to rely upon it, (3) justifiable reliance of the plaintiff on the misrepresentation or material omission, and (4) a resulting injury. *Guilbert v. Gardner*, 480 F.3d 140, 147 n.5 (2d Cir. 2007) (citing *Jablonski v. Rapalje*, 14 A.D.3d 484, 487 (2d Dep't 2005)). Plaintiff's claim for fraud is based on three separate statements by Defendants that Plaintiff alleges were material misrepresentations of fact: (1) that Plaintiff was

required to obtain a release from the Lock-Up Agreement before she could transfer her shares of Eyeblaster stock to Millennium; (2) that at the time Semple attempted to exercise her options, Eyeblaster still intended to proceed with the IPO, and therefore the Lock-Up Agreement was still in place; and (3) that Eyeblaster had no objection to Semple's plan to sell her stock to Millennium so long as she obtained the release from the Underwriters. Defendants argue that Plaintiff fails to raise a genuine issue of material fact as to whether Defendants made any material misrepresentations, and in any event, that Plaintiff failed to produce any evidence of justifiable reliance on any such statements.

Plaintiff's first argument – that the Lock-Up Agreement was invalid for failure of consideration, and therefore any statements by Defendants that she was required by the Lock-Up Agreement to obtain a waiver from the Underwriters was false – must fail. As discussed in detail above, the Lock-Up Agreement was not rendered unenforceable for lack of consideration; therefore, unless some other event occurred to terminate the Lock-Up Agreement or to release Plaintiff from its terms, the agreement remained in full force and effect, and Defendants' statements to that effect were not misrepresentations of fact.

Plaintiff's second argument is premised on the notion that Eyeblaster no longer intended to go forward with the IPO at the time she intended to exercise her options, and that consequently, pursuant to the Release Contingency provision of the Lock-Up Agreement, she was no longer required to obtain a waiver from the Underwriters, and any statements by Defendants that she was so required was false. There do appear to be some questions of fact as to whether Eyeblaster maintained the subjective intent to proceed with the IPO during the relevant time period. However, these questions are immaterial to the question before the Court, as they are irrelevant to the Release Contingency provision. That is, the Release Contingency provision was premised not on Eyeblaster's subjective private intent to proceed with the IPO, but on Eyeblaster's informing the Underwriters of its intent not to go forward. While there may be some questions about whether Eyeblaster actually intended not to proceed, there is absolutely no competent evidence[7] in

---

[7] The only record evidence to which Plaintiff points in support of her contention that Eyeblaster did not intend to go forward with the IPO was a July 13, 2008 email she sent to Millennium, in which she indicates that Firon had advised her that Eyeblaster was not going to proceed with the IPO in 2008. Plaintiff may not rely on this hearsay evidence to create a genuine issue of material fact. *See Major League Baseball Props., Inc. v. Salvino, Inc.*, 542 F.3d 290, 309 (2d Cir. 2008) (finding facts presented on summary judgment must be in a form that would be admissible at trial).

the record to suggest that Eyeblaster informed the Underwriters of that intent.[8] Accordingly, Plaintiff has produced no evidence from which a reasonable jury could conclude that the Release Contingency provision had been triggered to release Semple from her obligation to obtain the Underwriters' prior written consent to her contemplated transaction with Millennium, and Defendants' statements that she was required to obtain that consent were not false.

Finally, Plaintiff's third basis for her fraud claim – that Eyeblaster misrepresented that it had no objection to her proposed transaction with Millennium so long as she obtained the release from the Underwriters – fails as well because, even if these statements were material misrepresentations, Plaintiff has not produced a scintilla of evidence to indicate that she justifiably relied on them or that they caused her injury. As Plaintiff has failed to produce any record evidence that could cause a reasonable juror to reach any other conclusion on the fraud claim, Defendants' motion for summary judgment is granted.

### III. CONCLUSION

For the foregoing reasons, Defendants' motion for summary judgment is granted in part and denied in part. Plaintiff's claims for tortious interference with business relations, breach of contract and fraud are dismissed. Plaintiff's claim for breach of the implied covenant of good faith and fair dealing will proceed to trial on September 21, 2009. The Clerk of this Court is instructed to close this motion (Docket No. 53).

IT IS SO ORDERED.

New York, New York
September ____, 2009
August 27, 2009

_____
U.S.D.J.

---

[8] To the contrary, there is ample evidence, including Defendants' filing numerous registration statements with the SEC, that Eyeblaster intended to proceed with the IPO; the first and only indication on this record that Eyeblaster did not so intend was on December 24, 2008, when it withdrew its Form RW that it had filed with the SEC.